STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 101-7-13 Vtec |
|---|---|
| Zaremba Group CU - Jericho | DECISION ON THE MERITS |

Stuart Alexander, Amy Booth, Peter Booth, Susan Bresee, William Bresee, Joe Faryniarz, Susan Filipek, Martin Fisher, Jennifer Hatch, Jeffrey Hill, Laura Hill, Friederike Keating, Sean McCann, Michelle Pinaud, Catherine Stevens, Michael Willey, Donna Wyatt, Sara Youngman, and Jon St. Amour (together, Appellants) appeal the Town of Jericho Development Review Board (DRB) decision approving the conditional use application of Zaremba Group, LLC (Zaremba) to construct a 9,100 square foot retail building and associated site improvements at 265 Vermont Route 15 in the Town of Jericho, Vermont (the Town).

Zaremba filed a pre-trial motion for partial summary judgment asking this Court to dismiss Appellants Amy Booth, Joe Faryniarz, Susan Filipek, Martin Fisher, Jennifer Hatch, Jeffrey Hill, Laura Hill, Friederike Keating, Michelle Pinaud, Catherine Stevens, Michael Willey, Donna Wyatt, and Jon St. Amour (named Appellants) and to grant summary judgment in its favor as to their appeal. We concluded in an April 21, 2014 decision that the named Appellants did not participate and therefore have no standing in this appeal. Zaremba's motion for partial summary judgment was therefore **GRANTED**, and Appellants Amy Booth, Joe Faryniarz, Susan Filipek, Martin Fisher, Jennifer Hatch, Jeffrey Hill, Laura Hill, Friederike Keating, Michelle Pinaud, Catherine Stevens, Michael Willey, Donna Wyatt, and Jon St. Amour were **DISMISSED** as appellants.

In a second pretrial motion for partial summary judgment, Zaremba asked the Court to dismiss Appellant Stuart Alexander for lack of standing. In support of its motion, Zaremba argued that Dr. Alexander had not demonstrated a particularized injury different from the injury experienced by the general public. Specifically, Zaremba noted that Dr. Alexander owns property 3.5 miles from the project and that he drives by the project site approximately twice per week. We concluded in an April 21, 2014 decision that Dr. Alexander is not an interested

person under either § 4465(b)(4) or § 4465(b)(3). We therefore **GRANTED** Zaremba's motion for partial summary judgment, and **DISMISSED** Dr. Alexander.

Appearing at the site visit and merits hearing were Attorneys Alan P. Biederman and James Goss, representing Zaremba; Attorney James Allan Dumont, representing Appellants; and Albert W. Lindholm, participating as a self-represented litigant.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact.

**Findings of Fact**

1.      Zaremba seeks conditional use approval to construct an approximately 9,100 square foot building (130 feet by 70 feet 9 inches) for a retail Dollar General Store at 265 Vermont Route 15 in Jericho, Vermont.

2.      The building is proposed as a one-story structure 24 feet, 6 inches high with white clapboard siding to be located to the rear of the lot.

3.      As proposed, the building roof has a pitch of 12/15 and will be constructed of black metal standing seam.

4.      The Project lot, located within the Commercial zoning district, is approximately 1.92 acres and has 337.31 feet of frontage on Route 15.

5.      The Project lot has a 50 foot front yard setback, 20 foot side yard setbacks, and a 20 foot rear yard setback.

6.      The Project will cover approximately 43 percent of the Project lot.

7.      Six faux windows are proposed to be located on the front of the building.

8.      The Project will not involve outside display of items for sale or storage within the front yard setback.

9.      Customer parking is proposed to be primarily located in front of the Project building with five additional spaces along the west side of the building for a total of 35 spaces.

10.     Two signs are proposed for the Project. A 19 feet long and 18 inches high sign will be flush mounted on the front wall of the building. Five gooseneck lights will be located above the sign's yellow letters. A second roadside sign will measure 3 feet 6 inches by 2 feet with black letters on a yellow background. The roadside sign will be mounted on a pedestal with a total height of 5 feet.

2

11.     Project lighting will include five 16.5 foot tall pole mounted lights. Several wall mounted and canopy lights and motion detector activated security lights are also proposed.

12.     The Project lighting will be Dark Sky compliant.

13.     As proposed, the Project entails minor modifications to existing site topography.

14.     Currently, there is minimal vegetation and trees on-site. Proposed landscaping will enhance the vegetation and trees.

15.     The proposed landscaping includes five honey locust trees and three red oaks along Route 15, as well as a number of shrubs along the south edge of the parking area. Shrubs and bushes are proposed along the sides of the building.

16.     A rain garden and perennial garden will be located along Route 15.

17.     Two northwood maple trees, two red oak trees, spruce trees, rhododendrons, five crabapple trees, and numerous smaller plantings are proposed in the parking areas.

18.     Plantings, including lilacs and arborvitae, are proposed on the east side of the Project building and may grow to heights of 15 to 20 feet.

19.     The hours of operation of the Project will be 8:00 a.m. to 10:00 p.m., seven days per week.

20.     The Project will have 8 to 12 employees: 2 full-time and 6 to 10 part-time.

21.     Amy Booth resides with her husband Peter Booth at their residence at 352 Route 15 in Jericho, approximately eight-tenths of a mile from the Project site.

22.     Both Peter and Amy Booth ride bicycles to and from their residence on Route 15 past the Project site.

23.     The Booths will be able to see the Project as they bike in the area.

24.     The Project is adjacent to Route 15 and will present new traffic interactions between vehicles and bicycles due to a new curb cut and turning movements.

25.     Route 15 in the area of the Project has a 50 mile per hour speed limit.

26.     The Route 15 corridor in the area of the Project is not a High Crash Location.

27.     Intersection sight distances and stopping sight distances for the Project exceed Vermont Agency of Transportation (VTrans) minimum standards.

28.     Peak hour traffic on Route 15 in the area of the Project is from 7:15 to 8:15 a.m. and 4:45 to 5:45 p.m.

29. Based on trip generation estimates from the Institute of Transportation Engineers (ITE), the Project will generate 10 new a.m. peak trips, 7 entering and 3 exiting. The Project will generate 46 new p.m. peak trips, 23 entering and 23 exiting.

30. The Project site will have a single curb cut access.

31. The Good Shepard Lutheran Church (the Church) is located adjacent to the east of the Project.

32. The Church has a curb cut on Route 15.

33. The Church has a parking lot in front of the building along Route 15 much like the Project's proposed parking.

34. An existing curb cut located in the southeast corner of the Project lot, close to the driveway of the adjoining Church, will be eliminated and a new curb cut will be constructed at the southwest corner of the lot. The new curb cut will be approximately 36 feet wide and designed with two exit lanes (one left turn and one right turn) and one entrance lane.

35. A VTrans access permit has been obtained for the curb cut.

36. The curb cut will serve as access to any future development on what is currently vacant land to the west and north of the Project site.

37. The new separation distance between the existing Church driveway and the new curb cut conforms to VTrans regulations.

38. The Project will not have excessive queuing at the Project curb cut.

39. Level of Service (LOS) on Route 15 in the area of the new curb cut will operate at LOS A during a.m. and p.m. peak hours through 2018. Estimated LOS for left-turning vehicles approaching the Project will be LOS C for both a.m. and p.m. peak hours in 2013[1] with only very slight delay increases through 2018.

40. The Project includes 7 bicycle parking spaces located near the southeast corner of the Project building.

41. No vehicles will be required or permitted to back into Route 15.

42. Truck deliveries will consist of one tractor trailer per week during business hours and smaller UPS-size truck deliveries periodically.

---

[1] Based on Zaremba's credible Traffic Study, admitted as exhibit T, from April 2013.

43. The truck loading/delivery area is separated from customer parking areas.

44. Traffic circulation on-site will accommodate both customer vehicles traveling to and from parking spots and delivery truck movements on-site.

45. Presently there are no sidewalks along Route 15 in the area of the Project.

46. Project designs include a 10-foot wide sidewalk easement along Route 15 and from Route 15 to the Project building to allow for future sidewalk connections.

47. The Project site is located in a presently open field immediately north of and adjacent to Route 15 and west of the Church.

48. The Castle Cemetery (the Cemetery) is adjacent and to the north of the subject parcel and west of the Church. The Cemetery is owned by the Town.

49. The Cemetery includes graves and grave markers of Town residents, the last of which was interred in the 1920s.

50. The Cemetery is visible as one travels both east and west on Route 15.

51. The Cemetery is set back from Route 15.

52. A sign identifying the Cemetery sits above the entrance of the Cemetery. The sign is difficult to read from Route 15.

53. The Cemetery is not handicapped accessible. General access from the Church by deed or right-of-way is uncertain.

54. The Project will not alter existing access to the Cemetery, and as proposed the Project does not include additional access to the Cemetery.

55. The Cemetery is infrequently visited by the public.

56. If constructed, the Project will not entirely obstruct views of the Cemetery from those traveling in either direction along Route 15. However, the Project building and landscaping will block some views and reduce visibility of the Cemetery.

57. Albert Lindholm resides in Jericho Center approximately five to seven miles from the Project site.

58. Mr. Lindholm cannot see the Cemetery from his residence

59. Mr. Lindholm does not offer any physical or environmental impacts to his property interest from the Project.

60. The Town has not undertaken action to appoint Mr. Lindholm as a spokesperson, caretaker, or to otherwise responsible for the Cemetery.

61. The Project site is located in the Town's Commercial zone between two village centers, Jericho Corners and Riverside.

62. The Commercial zone stretches for approximately 4/5 of a mile along Route 15.

63. Eastward travel on Route 15 in the Project area presents stunning views of Mount Mansfield.

64. The Project area contains a mix of land uses including office, commercial, and light industrial uses. Additionally there are numerous residential uses, farm uses, and open land.

65. Some older farm structures and residential properties have served or continue to serve as smaller commercial or office uses.

66. Immediately to the west of the Project along Route 15 is the Jeri Hill Commercial Complex (the Complex).

67. The Complex is larger than the proposed Project.

68. The Complex has parking in front of the buildings along Route 15.

69. Included within the Complex are a storage facility, hardware store, video store, and pizza restaurant, some of which are housed in single story buildings with peaked roofs.

70. Across Route 15 to the south of the Project site are several residences and old farm buildings now used as a seasonal garden center.

71. The seasonal garden center has a curb cut on Route 15 and parking in front of the building.

72. Close to the west of the Project site is a home center and large storage warehouse. Both structures are white and large in size.

73. Offices and a yoga studio are located to the western limits of the commercial area in a development that somewhat resembles a strip mall.

74. Clark's Truck Center, a heavy equipment and school bus business, is located to the east of the Project site and on the southern side of Route 15.

75. The side streets off of Route 15 in the area of the Project serve several businesses.

76. The Jericho East Homeowners Association (JEHA) has a community water supply system which is located approximately 800 feet northwest of the Project site. Multiple private wells

6

are located within 2,000 feet of the Project site. There are no abandoned wells at or near the Project.

77.     Applicant completed a two year time of travel plume for its proposed waste water system. This plume does not intersect with the JEHA well.

78.     In the area of the Project and the JEHA well, there are two aquifers separated by almost 90 vertical feet. One is shallow and close to the surface and the other is deeper.

79.     There is no hydrologic connection between the shallow and deeper aquifers.

80.     The JEHA well draws its water from the deeper aquifer while the Project's waste water is discharged to the shallow aquifer.

81.     The Project is located in the Town's Well Head Protection Area 2 Overlay Zone.

82.     The Project has obtained a Potable Water/Wastewater Disposal Permit and a Transient Non-Community Water Supply Source Permit from the Agency of Natural Resources (ANR).

83.     Although the Project does not trigger the need for a stormwater discharge permit from ANR, the Project includes a stormwater discharge system that satisfies ANR's stormwater requirements.

84.     The Project design conforms to both the Vermont's Stormwater Management Manual (VSMM) and Jericho Public Works Specifications regarding stormwater.

85.     The stormwater design uses low impact smart design practices to manage stormwater. Stormwater is managed on the Project site with a rain garden and detention basins.

86.     There is a steep bank in the area where the Project lot adjoins the Cemetery.

87.     There are stabilization and sediment control plans for during and after Project construction.

88.     When the Project is completed, the steep area will be sloped, seeded, and grassed to prevent erosion.

89.     The Project does not propose any underground storage or piping relating to hazardous waste.

90.     The Project does not seek approval to collect, handle, manufacture, store, transfer, or dispose of hazardous material or waste. There are no petroleum storage tanks having a capacity greater than 1,100 gallons.

91.     The project includes an aboveground propane tank.

7

92. The Project has a spill cleanup protocol to address internal spills of chemicals and fluids within the store.

The parties advanced motions prior to, during and following trial. We rule on these motions as follows.

### Motion to Intervene

Immediately prior to the merits hearing, Amy Booth filed a motion to intervene as an interested party pursuant to 10 V.S.A. § 4465(b)(3).[2] At the beginning of trial, after hearing from the parties, we deferred ruling on the motion until all the evidence was before the Court. Although Mrs. Booth did not herself testify before the Court, we find her husband Peter Booth's testimony to be sufficient evidence to support the motion. At trial, Mr. Booth testified that his wife resides with him at their residence at 352 Route 15 in Jericho, approximately eight-tenths of a mile from the Project site. Furthermore, Mr. Booth testified that both he and Mrs. Booth ride bicycles on Route 15 to and from their residence past the Project site. Mr. Booth also testified as to how the Project would impact the aesthetics of the road as they bike along the area of the Project site and how the Project would present new traffic safety issues between vehicles and bicycles due to a new curb cut and turning movements.

Based upon the evidence in its entirety, including Mr. Booth's testimony, we conclude that Mrs. Booth is an interested party pursuant to 24 V.S.A. § 4465(b)(3) as a person owning property in the immediate neighborhood who can demonstrate a physical or environmental impact on their interest.[3] We therefore **GRANT** Amy Booth's motion to intervene.

### Motion to Strike Town's Post-Trial Brief

The Town entered its appearance in this matter prior to trail on September 24, 2013 by designating Todd Odit, Town Administrator, as its spokesperson. The September 24, 2013 notice of appearance expressly stated that the "Town does not wish to take an active role at this time, but we request to be kept informed of the case and attend the conference calls." During the second day of Trial, May 5, 2014, Selectboard member Tim McNulty asked that a

---

[2] Peter Booth joined in this motion, however, at the beginning of trail we ruled that the motion as to Mr. Booth was moot as Mr. Booth already had appellant status and Zaremba is not challenging that status.
[3] In further support of this conclusion, we note that we routinely allow spouses to represent the joint interests between spouses and to conclude that Mrs. Booth does not share interested party status with Mr. Booth would be an absurd result.

8

letter from the Selectboard be accepted into evidence. Based upon a stipulation of the parties, the letter was admitted into evidence. After our trail concluded, on June 16, 2014, the Town of Jericho Selectboard filed a Post-Trial Brief. The filing was signed by three Selectboard members.

Although the Town has party status as an "interested person" pursuant to 24 V.S.A. § 4465(b)(2), we conclude that the Town's post-trial filing is inappropriate and must be stricken from the record for two reasons. First, to the extent the brief offers facts or evidence after trial, it is inappropriate. Vermont Rules of Civil Procedure Rule 43 requires that the testimony of witnesses be taken orally in open court for all trials. Only by proceeding in this manner can we assure all parties a fair and full hearing. Second, to the extent that the brief offers legal argument, it must be filed through an attorney, licensed to practice law, who formally appears before the Court as representing the Town. See LaBrie, Inc. v. Vermont Dept. of Environmental Conservation, 157 Vt. 642, 643 (1991) (holding that "generally a corporation must appear through counsel"); see also Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir.1967) (asserting that a corporation, as an artificial entity that can only act through its agents, cannot proceed pro se). Appellants assert that because all Selectboard members signed the brief, it is the Selectboard itself filing the brief, not some form of representation. We disagree. The Town is the entity appearing before the Court, while the Selectboard is the governing body acting on behalf of the entity.

The issue of non-lawyers representing municipal entities has a common presence before the Environmental Division. Upon the filing of a written designation, we allow non-lawyers to appear on behalf of municipalities for observation only. In such cases, the non-lawyer is told during the initial pretrial conference that they are welcome to observe, however, should the municipality wish to be heard, file a motion or file in response to a motion, or participate in trial, then representation by a lawyer is required. This warning occurred in this matter and was repeated on the second day of trial when Mr. McNulty attended trial and asked that a letter from the Selectboard be accepted into evidence.

In limited and exceptional circumstances, the Supreme Court has allowed corporations or entities to be represented by a non-lawyer. In this matter, however, the Town never made

9

such a request, through motion or otherwise, for the Court to consider or the other parties to weigh in on.

For these reasons, the Town's Post Trial Brief is **STRICKEN**.

**Motion to Dismiss Albert Lindholm**

On the third day of trail, Zaremba verbally moved to dismiss Albert Lindholm as a party, both individually and as a spokesperson for the neighboring Cemetery. The Cemetery is owned by the Town. The Town has not appointed Mr. Lindholm as a spokesperson, caretaker, or to otherwise have responsibility for the Cemetery. Thus, we conclude that Mr. Lindholm does not represent the Cemetery.

Individually, Mr. Lindholm does not satisfy the elements of party status. Mr. Lindholm resides in Jericho Center approximately five to seven miles from the Project site. Thus, he does not own property or reside in the immediate neighborhood. Furthermore, Mr. Lindholm cannot see the Cemetery or Project lot from his residence and he does not offer any physical or environmental impacts to his property interest from the Project. See Bostwick Road Two-Lot Subdivision, No. 211-10-05 Vtec, slip op. at 5 (Vt. Envtl. Ct. Feb. 24, 2006) (Durkin, J.), aff'd No. 2006-128 (Vt. Jan. 25, 2007), available at https://www.vermontjudiciary.org/UPEO2006-2010/eo06-128.aspx.

Based upon this evidence, the Court **GRANTED** Zaremba's motion to dismiss Mr. Lindholm on the record. The Court then, however, allowed Appellants to reopen their direct case and call Mr. Lindholm as a witness. The Court then accepted Mr. Lindholm's testimony.

**Appellant's Questions before the Court**

We now turn to Appellants' Statement of Questions. Appellants' Question 1 asks broadly whether the Project satisfies the Conditional Use standards in the Town of Jericho Regulations (the Regulations). Appellants' subsequent Questions relate to specific conditional use criteria at issue in this appeal. We consider each of the specific conditional use criteria challenged by Appellants.

A.    Conditional Use Criteria Related to the Capacity of Roads and Sidewalks

Appellants' question 2.a (10.9.3.1) asks "[a]re the capacities of roads and sidewalks and connecting networks and cross walks adequate to provide access to the proposed use at the

time of anticipated occupancy, including by alternate modes of transportation (including non automobile modes, per the Town Plan)?"

There will be a single curb cut providing access from Route 15 to the Project site. An existing curb cut in the area of the Project will be eliminated and the new curb cut will be constructed at the southwest corner of the site. The new curb cut, authorized by a VTrans access permit, will be approximately 36 feet wide and designed with two exit lanes (one left turn and one right turn) and one entrance lane. The new curb cut will likely serve as future access to vacant land to the west and north of the Project site.

Customer parking will primarily be located in front of the Project building, with 5 spaces along the west side of the building, for a total of 35 spaces. On-site traffic circulation will accommodate customer vehicles traveling to and from parking spots and delivery truck movements on-site. The Project also includes 7 bicycle parking spaces. Due to considerable sight distances along Route 15 in the area of the Project's curb cut and the modest number of trips generated by the Project, bicyclists using Route 15 in the Project area will not be adversely affected by the addition of Project traffic.

At present there are no sidewalks in the area of the Project site, but Project designs include a 10-foot wide sidewalk easement along Route 15 and from Route 15 to the Project building to allow for future sidewalk connections.

We therefore conclude that the capacities of roads and sidewalks and connecting networks and cross walks are adequate. We also conclude that the traffic from the Project will not result in an undue adverse impact on Route 15 traffic.

B.    Conditional Use Criteria Related to the Character of the Area and the Purpose of the Zoning District

Appellants' Question 2.b$_1$ (10.9.3.2) asks "[w]ill the development cause undue adverse impact on the character of the area 'as defined by the purpose of the zoning district in which the use is located, and by specifically stated policies and standards of the Jericho Comprehensive Town Plan?'" Whether the project complies with the purpose of the zoning district is also raised in Question 2.d. These issues are further addressed in Question 2.c (10.9.3.2(b)), which asks "[w]ill the proposed use be in general harmony with the historic, rural,

open and agricultural character of the surrounding neighborhood and not adversely impact abutting residences or other property, particularly when it is understood that the existing commercial structures were permitted prior to the adoption of the current town zoning regulations and Town Plan?" We consider all three questions in analyzing whether the Project will have an undue adverse impact on the character of the area.

Regulations § 10.9.3.2(b) requires that the project "be in general harmony with the character of the surrounding neighborhood and will not adversely impact abutting residences or other property." Whether a project will "be in harmony with its surroundings depends on whether it 'fits' in the context of the area where it will be located." Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). To determine whether the project will be in harmony with the character of the surrounding area and not adversely impact abutting residences or other property, we employ the "Quechee Test." See In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 12 (approving use of the Quechee test as guidance in defining adverse effects of specific items in the zoning bylaws).

The Quechee Test requires that we assess the project's compatibility with the surrounding area. See In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 24, 185 Vt. 296 (applying the Quechee test); see also In re Quechee Lakes Corp., 154 Vt. 543, 555–57 (1990) (reviewing Environmental Board's decision regarding aesthetic impact of proposed Act 250 permit amendment). Compatibility depends on the project's design, including its scale, materials, and form relative to existing buildings in the immediate area. See Id. at ¶ 13 (finding that a consideration of the adverse aesthetic effects of the project within the immediate area was a proper application of the legal standard). The Court must therefore consider the Project in the context of the area's character, including existing buildings, nearby developments, and roadways. See In re Cross Pollination, 2012 VT 29, ¶ 11, 191 Vt. 631 (considering a visual analysis of the project within the proposed area under the Quechee test).

As proposed, the Project fits in the context of the area where it will be located. The Project will be a single-story structure with clapboard siding, a pitched roof, and six faux-windows on the street-facing façade. Thirty-five parking spaces, 30 along the front of the

12

building and 5 along the side, will accommodate customers. Two yellow and black signs will be flush mounted on the front wall and along the roadside, respectively.

The scale, materials, and form of construction are not unique to the Project. At present within the immediate area of the Project site, there is a mix of office, commercial, and light industrial uses occupying older farm structures and residential properties as well as modern commercial structures. Directly across Route 15 there are several residences and old farm buildings used as a seasonal garden center with a curb cut along Route 15 and street-facing parking spaces. Several of the properties along Route 15 have parking along the street-facing side of buildings. Additionally, a home center and large storage warehouse, both white in color, lie to the west of the Project site. The Jeri Hill Commercial Complex, a development larger than the Project, consists mainly of single-story buildings with peaked roofs and occupies the western limits of the zoning district. The Complex has parking in front of the building along Route 15. Clark's Truck Center, a heavy equipment and school bus business, lies to the east of the Project site. Relative to these existing developments, the Project fits in the context of the surrounding area.

Considering testimony that a white building would be in higher contrast to the surroundings and therefore more noticeable, the parties agreed that changing the Project building's color to a medium brown, green, or gray would soften the appearance of the Project. We therefore will impose this suggestion as a condition and require that the Project building be a medium brown, green, or gray.

While the Project would impact historic assets, such as the Cemetery, and scenic views, including Mount Mansfield, these impacts are minimal. As one drives east on Route 15 there are significant views of Mount Mansfield to the south. Although the Project will be visible as part of this view, because the Project is located on the north side of Route 15 and Mount Mansfield is to the south side of Route 15, the Project will not significantly impact the views of Mount Mansfield. We conclude that while certain elements of the Project design may have adverse aesthetic impacts, those impacts are not undue.

The failure "to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings" renders any adverse impacts resulting from that failure unduly adverse and therefore grounds for denial of

the application.  Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 11 n.2.  Appellants provided testimony at trial that, in the opinion of their credible expert, rotating the building to move the parking to the side and having the longer side of the building facing east rather than south towards Route 15 would help minimize visual impacts of the project.  According to Appellants, this modification would reduce distraction from views of Mount Mansfield caused by the Project.  Zaremba presented evidence, however, that rotating the building would require completely redesigning the Project, including relocating the wastewater system, the water supply well, and other Project features.  We conclude, therefore, that this type of change is not a generally available mitigating step that a reasonable person would take.  Furthermore, these suggested Project modifications would likely constitute substantial changes requiring remand.  The Court would therefore be without the power to order the mitigating step Appellants suggest.

Appellants also question whether buildings and developments permitted prior to the adoption of the current Regulations should be excluded from the analysis of the character of the area under § 10.9.3.2(b).  When interpreting § 10.9.3.2, the Court applies the familiar principals of statutory interpretation.  See In re Vt. Natl Bank, 157 Vt. 306, 312 (1991).  We will therefore interpret the Regulations to give effect to the intent of the municipal legislative body that drafted them, beginning with the ordinary meaning of the plain language.  See Town of Killington v. State, 172 Vt. 182, 188 (2001).

Title 24 of the Vermont Statutes Annotated, § 4414, which authorizes municipalities to condition land development on specific and general standards, requires that the standards conform to those within the enabling legislation.  Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 11.  Looking to the relevant provision from title 24, § 4414(3)(A), an "adverse effect" on the character of the area is prohibited, "as defined by the purpose or purposes of the zoning district within which the project is located, and by specifically stated policies and standards of the municipal plan."  Appellant offers no evidence, and the Court finds nothing in the Regulation's discussion of the "character" of the commercial district, or any other district, to suggest that the definition of "character" depends on when existing structures in the area were permitted.  Looking to other provisions addressing "character," there is no indication that the Regulations contemplate that the character of a specific zoning district is defined only by structures that were permitted under the current zoning regulations.  To infer such a requirement would

14

generate a clean slate every time the Regulations are updated.  This would erode predictability within the district because developers would have difficulty knowing the context in which their projects will be evaluated.

Even more persuasive, Regulation § 11.9.5, addressing general development standards, expressly requires that new projects are compatible with "existing" improvements and the character of the area as defined by the purpose of that zoning district.  Again, nothing in the purpose section indicates whether the character of the area is limited to consideration of those buildings permitted under current Regulations.  Section 11.9.5 also expressly addresses the existence of nearby structures that do not "contribute positively to the character of the Town."  It fails, however, to indicate whether structures permitted prior to the current Regulations fall under this categorization.

Furthermore, § 11.9.5 expressly states that atypical structures are not to be "regarded as a justification for perpetuating or expanding the effect."  Id.  This language does not alter the definition of "character," nor does it require an inquiry into how or when those adverse buildings were developed or the contribution of such buildings or uses on the area as a whole.  Instead, it prevents reliance on existing atypical buildings or structures to justify similar deviations.  See Willowell Foundation CU, No 142-10-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. July 10, 2014) (Walsh, J.) (considering past and existing structures as contributing to the character of an area).  Because the Quechee Test will be applied "reasonably to prohibit only substantial and material adverse effects," In re Miller, 170 Vt. 64, 69 (1999), we do not consider whether the existing buildings and uses were permitted prior to the adoption of the current Regulations.

Appellants' Question 2.d (§ 10.9.3.2(c)) asks "Will the proposed use be compatible with the 'stated purpose' of the Commercial District, which is to accommodate those uses that cannot or should not be accommodated in the Village Center Districts?"  The proposed location for the Project is within the Town of Jericho's Commercial District.

> The purpose of the Commercial District is primarily to provide employment opportunities and a location for minimum impact commercial enterprises that cannot or should not be located in the Village Center District.  While roadside visibility is important for the viability of some businesses, measures should be taken to prevent the appearance of strip development.  ...  Green space,

15

landscaping and other visual treatments may be necessary to soften the appearance of development, particularly along Route 15.

Regulations § 3.2.6. This provision is made applicable in conditional use review through § 10.9.3.2(c), which requires that "the proposed use, including any building associated with the use, will be compatible with the stated purpose of the zoning district in which the use will be located." Appellants and Applicant dispute whether the Project is compatible with the purpose of the Commercial District.

As noted above, we interpret a zoning ordinance we use the familiar rules of statutory construction and will "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262 (citations omitted). We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted).

The project applicant bears the burden of proving compliance with the zoning regulations. See In re Miller Subdivision Final Plat, 2008 VT 74, ¶ 17–18, 184 Vt. 188 (finding that the environmental court did not improperly shift the burden from the applicant to the neighbor opposing the subdivision). Appellants argue that Applicant has failed to meet its burden of providing sufficient evidence for the Court to find that the conditional use standard in § 10.9.3.2(c) has been met. Specifically, Appellants contend that because Applicant did not prove that the project could not be located in the Village Center District, it has failed to show that the project complies with the stated purpose of the Commercial District. That argument, however, relies on a constrained reading of the stated purpose of the Commercial District and defies common sense.

The purpose of the Commercial District is, as its name suggests, to accommodate commercial development, specifically commercial development that is ill suited for the Village Center District. The plain language of the Regulations allows both development in the Commercial District that <u>cannot</u> be located in the Village Center District and development that <u>should not</u> be located in the Village Center District. The Court will not read this language to require that an applicant prove that a project cannot be located in the Village Center District by seeking conditional use approval in that district <u>before</u> seeking conditional use approval in the

16

Commercial District. If the Regulation intended to limit development in the Commercial District to only that which <u>could not</u> be located in the Village District, this section would have included a mandatory provision clearing stating so, or in the alternative, it would not have offered the "should not" alternative to "could not."

Whether a conditional use is appropriate in a given location is a fact-intensive and ad hoc inquiry. Absent a complete zoning application, one could not determine whether a particular conditional use development <u>could</u> be approved. Because many uses, including the Project use of a general merchandise retail store greater than 3,000 square feet, are classified as conditional uses in both the Village Center District and the Commercial District, it would be extremely inefficient for the Town to require an applicant to apply for and be denied a permit in the Village Center District as a predicate to applying for a permit in the Commercial District.[4] It would also be unduly burdensome on the project applicant. Furthermore, such a requirement would be contrary to the stated purpose of the Commercial District, which includes providing employment opportunities and, at the very least, a location for minimum impact commercial enterprises that <u>should not</u> be located in the Village Center District. Thus, Applicant need not prove that it could not possibly be located in the Village Center District by having an application denied in order to satisfy § 10.9.3.2(c) of the Regulations.

Rather, to give effect to the purpose provision in a reasonable way, we need only consider the proposed use, the description of the proposed development, and the description of the Village Center District in order to determine whether the proposed development is of a type that <u>should</u> be located in the Village Center District. The stated purpose of the Village Center District is, in part:

> [T]o encourage the concentration of people and community-focused activities in the traditional centers. . . . These areas generally retain an architectural character that constitutes a valuable and unique part of our culture heritage. . . . In addition to the buildings themselves, the character of the villages is defined by the relationship of the structures with one another, with the roads, and with

---

[4] We also note that under the Table of Uses, Regulations § 4, certain uses, such as a general merchandise retail use less than 3,000 square feet, are permitted as of right in the Commercial District while are either permitted or conditional uses in the Village Center district. It makes little sense to interpret the purpose provision as prohibiting in the Commercial District any commercial enterprise that could be located within the Village Center District when the Regulations themselves allow for that exact result by providing for no review at all of certain commercial uses in the Commercial District but requiring conditional use review in the Village Center District.

open land.  The layout of new buildings should reflect traditional patterns and encourage use by pedestrians.  Generally, large setbacks with parking in front of the building are less inviting to pedestrians than buildings close to the road with parking to the side or rear.

Regulations § 3.2.7.  The Project, as described above, is a 9,100 square foot general merchandise store which anticipates that customers will access by automobile.  This does not fit well with the Town's encouragement of pedestrian friendly development and limited parking within the Village Center District.  While the Regulations should not be read in such a way that encourages an applicant to design a project to be incompatible with the Town's goals for the Village District to secure the right to develop in the Commercial District, that is not at issue in the present case.  The Project has been designed to fit the needs of the developer while still complying with the Town's Regulations.  The Project is a minimum impact commercial development that is not well suited for the Village Center District and should not be located in that District.  The Project is, therefore, compatible with the stated purpose of the Commercial District and satisfies § 10.9.3.2(c) of the Regulations.

We therefore answer Appellants' Questions 2.b$_1$ in the negative; the Project will not have an undue adverse impact on the character of the area.  Furthermore, the Project will be in general harmony with its surroundings.  In so concluding, we do not rely on the aspects of existing commercial structures causing adverse impacts in the area because the Project will not be a perpetuation or expansion of any aspect that is not in conformance with the Regulations.  Finally, we find that the Project is a minimum impact commercial enterprise that complies with the stated purpose of the Commercial District in which it is to be located.

C.      Conditional Use Criteria Related to Nuisances or Hazards to the Public

Appellants' Question 2.b$_2$ (§ 10.9.3.2(a)) asks:

Will the development cause:
        (i) a traffic nuisance or hazard due to left turn volume in and out of the planned driveway during peak hours, the proximity to the Rt 15/Browns Trace intersection that already has documented safety concerns, the compatibility of the development with the 50 mph speed limit required by the State for this section of Rt 15 and lack of control by the Town of Jericho to this section of state highway and ability to address issues, or
        (ii) a nuisance or hazard to the public water supply provided via the nearby Jericho East well serving over 50 families, or

18

(iii) a nuisance or hazard to the public's health, safety or welfare because of impacts on visibility and accessibility of the adjacent historic Jericho Cemetery?

We consider these sub-questions in turn.

First, the Project will not cause a traffic nuisance or hazard. The new curb cut will be designed with two exit lanes (one left turn and one right turn) and one entrance lane. The LOS on Route 15 in the area of the new curb cut will operate at LOS A during a.m. and p.m. peak hours through 2018. The LOS for left-turning vehicles approaching the Project will be LOS C for both a.m. and p.m. peak hours in 2013 with only very slight delay increases through 2018. The Project will generate 10 new a.m. peak trips—7 entering and 3 exiting—and 46 new p.m. peak trips—23 entering and 23 exiting. Although there will be increased traffic, the impacts of that increase will not be major. There will be no excessive queuing at the Project curb cut. The Route 15 corridor in the area of the Project is not a High Crash Location and there is no evidence to suggest that the Town lacks control of Route 15 in the Project area. We therefore conclude that the Project will not cause a traffic nuisance or hazard.

Second, the Project will not cause a nuisance or hazard to the public water supply. The Project is designed and permitted with an on-site water supply well and an on-site waste water system. The JEHA has a public community water system/well northwest of the Project, but there is a hydrologic separation between the aquifer that the JEHA water supply draws on and any aquifer that may even possibly be affected by the Project. There is no additional credible evidence to suggest that existing water supply wells will be adversely impacted by the Project.

Further, the Project design conforms to both the Vermont's Stormwater Management Manual (VSMM) and Jericho Public Works Specifications, required under the Regulations. See Regulations § 11.13.1.2. While the Project does not trigger the need for a stormwater discharge permit from ANR, it includes a stormwater discharge system that satisfies ANR's stormwater requirements. As such, the Project satisfies § 11.13.1.2. Because credible evidence indicates that neither stormwater runoff nor domestic waste water from the Project will have any adverse impact on the JEHA water supply, we conclude that there will be no nuisance or hazard to existing water supplies.

Finally, the Project will not cause a nuisance or hazard to the public's health, safety, or welfare because of impacts on visibility and accessibility of the adjacent historic Cemetery. Although the Project will block or reduce certain views, vehicles driving both east and west on Route 15 will continue to have some views of the Cemetery. Project landscaping will balance the competing interests of minimizing views of the Project from the neighboring Church and maintain views of the Cemetery on the easterly side of the Project from Route 15. Furthermore, the landscaping satisfies the specific requirements set forth in Section 11 of the Regulations. The landscaping provides a partly wooded and garden view along Route 15, which will soften views of the Project. Because the parking area is at a lower elevation than Route 15, headlights of vehicles parked at the project will be shielded by the change in elevation as well as by landscaping. We do find, however, that adjusting the location of plantings on the east side of the Project building by moving them closer to the building will improve views of the Cemetery while maintaining the screening effect. We therefore require that Zaremba move the plantings as close to the building as is reasonably possible in order to maximize views of the Cemetery.

Finding the present legal status of access to the Cemetery uncertain, and absent evidence that the Project adversely affects access to the Cemetery, we conclude that the Project does not present a nuisance or hazard to the public's health, safety or welfare because of impacts on visibility and accessibility of the adjacent historic Cemetery.

D.      Remaining Questions

Appellants' Question 3 asks:

[C]an the applicant meet its burden of satisfying all of the Performance Standards in the Jericho Land Use and Development Regulations ("Jericho Regulations"), incorporated by reference into conditional use review, including but not limited to Section 5 (Dimensional Standards, especially lot coverage percentage), Section 6.6 (Wellhead Overlay District, especially regarding fire retarding systems and storm water treatment), Section 8 (Flood Hazard Area Regulations), and Section 11 (General Development Standards)?

We address the specific sections of the Regulations raised by this question. Beyond these specific sections, we conclude that the Project satisfies the remaining Performance Standards in the Regulations.

20

First, the dimensional standards for the Project are set forth in Table 5.7 of the Regulations.  According to Table 5.7, the minimum lot size in the Commercial District is 1 acre and the minimum road frontage is 150 feet.  Table 5.7 also requires a 50 foot front yard setback, 20 foot side yard setbacks, and a 25 foot rear yard setback.  The maximum lot coverage in the Commercial District is 60% and the maximum structure height is 34 feet.  Based upon the above findings of fact, the Project as proposed satisfies the minimum/maximum dimensional standards.

Second, the Project site is in the Wellhead Protection Area Overlay District and § 6.6 of the Regulations therefore applies.  Under § 6.6, all conditional uses within the Commercial District are allowed as conditional uses within the Wellhead Protection Area Overlay District.  Thus, if the Project obtains conditional use approval in the Commercial District, it will also comply with the Wellhead Protection Area Overlay District.  Additionally, § 6.6 requires that the Project leave at least 50% of the lot uncovered in this Overlay District unless "low Impact Development practices and techniques to manage stormwater" are implemented.  As proposed, the Project has less than 50% lot coverage and will have significant design elements to manage stormwater and minimize impacts.  The specific provisions regarding underground storage tanks and hazardous materials are not relevant as neither will be present on the Project site.  Finding that Applicant provided considerable evidence through testimony and exhibits which establish compliance with § 6.6, that Appellants did not provide testimony or exhibits challenging Applicant's evidence, and based upon our above findings of fact, we conclude that the Project complies with § 6.6 of the Regulations.

With respect to Regulations § 8, Flood Hazard Area Regulations, neither party provided evidence specifically addressing this topic.  We will not require an applicant to address every section of a bylaw or regulation which is inapplicable to a proposed development.  Thus, without evidence that the Project site is subject to the Flood Hazard Area Regulations, we will not impose a burden on the Applicant to produce any evidence regarding this section.  We conclude that the Applicant is not required to comply with the Flood Hazard Area Regulations.

Finally, Appellants raise the issue of broad compliance with Regulations § 11, General Development Standards.  Section 11 of the Regulations is 22 pages long covering the following topics: public/private roads and driveways, parking/loading/circulation, pedestrian facilities, lot

layout, grading slope and ridgeline, recreation/open space/common land, water supply and sewage disposal, landscaping, site layout and design, outdoor storage/display, outdoor lighting, utilities, storm water, and performance standards. To the extent any of these issues or topics are raised by the Appellants specific questions within their Statement of Questions, we directly address those questions in specific sections of this decision; otherwise, we conclude that either the specific subsections of § 11 are inapplicable to the Project or that the Project complies with the subsections of § 11 of the Regulations.

We conclude with Appellants' final Question. Question 4 asks:

Can the applicant meet is burden of satisfying the requirement of the Conditional Use enabling statute 4414(3) that the project shall not adversely affect: (A) The capacity of existing or planned community facilities; (B) The character of the area affected; (C) Traffic on roads and highways in the vicinity; (D) Bylaws then in effect; or (E) Utilization of renewable energy resources?

We address subsections (B), (C), and (D) of this Question in prior sections of this decision. In addition to our conclusions with respect to the effect that the Project may have on the capacity of existing or planned community facilities, we conclude that the Project will not have an impact on schools or school services. Furthermore, as the Project has onsite sewage treatment, there will be no impact on municipal sewage facilities. Neither will the Project impact the municipal fire service. As designed, the Project includes a Knox Box allowing fire safety personnel to obtain access into the Project building. With this feature, the Project will not adversely affect the municipal fire service of the Underhill-Jericho Fire Department. Lastly, the Project will not have an impact on the utilization of renewable energy resources.

**Conclusion**

We conclude that Amy Booth is an interested party pursuant to 24 V.S.A. § 4465(b)(3) and we therefore **GRANT** her motion to intervene. The Town's Post Trial Brief is **STRICKEN.** Albert Lindholm is **DISMISSED** from this matter. As stated in greater detail above, the Project complies with the general and specific conditional use standards and the performance standards in the Town of Jericho Zoning Regulations. The Project also complies with the requirements of the conditional use enabling statute, 24 V.S.A. § 4414(3). In reaching these conclusions we do, however, impose the following two conditions:

22

1. The plantings on the east side of the Project building shall be moved closer to the Project building's east wall to minimize impacts to the views of the Cemetery from Route 15 while also creating a softening/screening effect for the benefit of the neighboring Church.

2. The Project building's color shall be changed to a medium brown, green, or gray.

This concludes the matter before the Court. A Judgment Order accompanies this Merits Decision.

Electronically signed on November 07, 2014 at 01:15 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division